## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHRISTOPHER GROSS,

        Plaintiff,

    v.                                 Case No. C-1-06-205

ILLINOIS TOOL WORKS, INC.,

        Defendant.

### ORDER

    This matter is before the Court upon defendant's motion for summary judgment (doc. 24), plaintiff's opposing memorandum (doc. 28), and defendant's reply (doc. 51). The parties have filed proposed findings of fact and conclusions of law, which the opposing side has highlighted as true, false, or irrelevant (docs. 52, 55). The Court heard oral arguments on the motion on August 20, 2008.

### I.  Introduction

    Plaintiff Christopher Gross brings this action against Illinois Tool Works, Inc. (ITW). Plaintiff makes the following allegations in the complaint: Plaintiff was born in 1953. He began his employment as National Accounts Manager with Defendant on or about November 30, 1999, and was promoted in 2001 and again in 2003. Plaintiff was diagnosed in 2004 with cancer, a serious health condition. He underwent surgery in or about April 2004 and was off work for approximately four weeks. Defendant placed Cedric Shaw, who was at least seven years younger than plaintiff, into the position of Group General Manager on or about November 2004,

1

and Shaw proceeded to remove plaintiff from his supervisory duties.  Although plaintiff was responsible for a successful sales team, he increased new revenue, and he met his non-revenue goals in 2005, defendant terminated plaintiff on or about November 15, 2005.  Plaintiff's termination allowed defendant to retain and hire substantially younger, less qualified employees. Based on these allegations, plaintiff brings claims for age discrimination in violation of Ohio Rev. Code Ch. 4112 and Ohio public policy; retaliation for exercise of his rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq.; and violation of his rights under ERISA, 29 U.S.C. § 1001.

## II.  Motion for Summary Judgment

Defendant moves for summary judgment on all claims.  Defendant argues that it is entitled to summary judgment on plaintiff's age discrimination claim because there is no direct evidence of discrimination; plaintiff was not replaced and none of the employees who he might allege to have replaced him were substantially younger than plaintiff; his termination did not permit the retention of substantially younger employees; even if plaintiff were to articulate a prima facie case, defendant has articulated a legitimate, non-discriminatory reason for terminating his employment, which is significant performance deficiencies; and plaintiff cannot prove that defendant's reason for terminating him was a pretext for age discrimination. Defendant alleges that plaintiff has no evidence to show that there were any similarly-situated employees who were treated more favorably and defendant is entitled to the benefit of the same actor inference.

Defendant contends that plaintiff's public policy claim fails as a matter of law because Ohio does not recognize a common law tort claim for wrongful discharge based on Ohio's public

policy against age discrimination as the remedies in Ohio Rev. Code Ch. 4112 provide complete relief for a statutory claim for age discrimination.

Defendant argues that plaintiff's FMLA claim fails as a matter of law because plaintiff did not suffer an adverse employment action by being stripped of his supervisory duties as part of the company's reorganization when he returned to work after cancer treatment; there is no evidence of a causal connection between plaintiff's leave of absence and the alleged adverse action seven to eight months later; and even if plaintiff were able to establish a prima facie case of retaliation, defendant had a legitimate, nondiscriminatory reason for the action it took and plaintiff cannot show that the reason was pretextual.  Defendant alleges that plaintiff cannot establish an FMLA claim in connection with his termination because he cannot demonstrate a causal connection between his exercise of FMLA rights and his termination, which occurred 19 months later.

Finally, defendant asserts that plaintiff's ERISA claim fails as a matter of law because there is no evidence that defendant terminated plaintiff with a specific intent to interfere with his ERISA benefits and no evidence of a causal link between his use of medical benefits and his termination, defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination, and plaintiff cannot establish pretext.

### III.  Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

3

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* (citing *Cities Serv.*,  391 U.S. at 288-289).  The Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as matter of law."  *Id.* at 251-52.  If the evidence is merely colorable, *Id.* (citing *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967)), or is not significantly probative, *Id.* (citing *Cities Serv.*, 391 U.S. at 290), judgment may be granted.

## IV.  Undisputed facts

1.     ITW is a global company that produces engineered fasteners and components, equipment and consumable systems, and specialty products.

2.     Unipac is an ITW business unit that produces foil/plastic laminates used in the packaging industry.

3.     Plaintiff, who was born in 1953, was hired by Unipac as a National Account Manager in November 1999.  The position was offered to him by Richard Kelley, General Manager

4

and Vice-President of Sales, and Jerome Anderson, Group General Manager.

4.     In 2001, plaintiff was promoted to Marketing Supervisor.  Kelley made the decision to promote plaintiff.

5.     Plaintiff worked out of his home office in Cincinnati and reported directly to Kelley until about December 2002, when Wayne Gow, the Healthcare Business Unit Manager, took over his supervision.  Gow supervised plaintiff from January 2003 until November 2004, when Kelley resumed that role.  Gow reported directly to Kelley.

6.     In 2003,  plaintiff was promoted to Sales and Marketing Manager.  Kelley again made the decision to promote plaintiff.  After this promotion, plaintiff was responsible for supervising certain individuals, including Ron McKinley.

7.     As a member of Unipac's outside sales team, plaintiff was responsible both for managing annual sales and maintaining client relationships for a number of customer accounts.  Plaintiff's assigned accounts included two of Unipac's top five customers, Owens-Illinois and Rexam Closures.  Early in his career, plaintiff's accounts included Seaquist, another one of Unipac's top five customers.

8.     Plaintiff had cross-selling responsibilities.  That is, his team had responsibility for accounts that bought other health care products and accounts that bought from another of defendant's business units.

9.     Defendant employs a customer service philosophy known as 80/20, meaning 20% of its customers generate 80% of its business and defendant places its customers into separate quads based on the business they provide.

10.    The 20% of customers responsible for 80% of defendant's business were in the territory

5

known as "Quad 1."  Owens-Illinois was one of these customers.

11.    In September 2003, which was shortly after plaintiff's father had suffered a heart attack and died, Gow and Kelley placed plaintiff on a Performance Improvement Plan (PIP).

12.    Plaintiff responded in a letter addressing each of the concerns enumerated in the PIP and devised a plan to address issues raised by Gow and Kelley.  He also completed the PIP.

13.    Michael McDaniel, the General Manager for Owens-Illinois, informed Kelley that Owens-Illinois had lost confidence in plaintiff's ability to get the job done and wanted to work with a different account representative.

14.    In or around April 2004, plaintiff notified both Gow and Kelley that he had been diagnosed with prostate cancer and he would need to take leave for treatment.  Kelley told plaintiff to take all the time he needed.  He had surgery to treat the cancer and took four to five weeks of leave in April and May of 2004.

15.    Cedric Shaw, who became Unipac's General Manager and Kelley's Supervisor in November 2004 at the age of 46, was aware that plaintiff suffered from cancer.

16.    Plaintiff received a performance appraisal from Gow in December 2004 and earned "on target" and "above target" in every category.  His overall rating was "on target."  Plaintiff received a pay increase of 4%, effective March 2005.  Kelley signed off on plaintiff's performance review.

17.    Defendant's sales suffered in 2004.  Subsequently, in the early part of 2005, plaintiff attended a meeting in which organizational changes, including changes to plaintiff's position as Sales and Marketing Manager, were discussed.

6

18.    In early 2005, Shaw reorganized Unipac, utilizing a supply chain approach.  Pursuant to that approach, Unipac created a Supply Chain Manager position to whom Unipac's customer service employees would ultimately report.  As a result of the reorganization, plaintiff lost his direct reports.  The two customer service representatives who reported to him were reassigned first to Unipac's Controller and then to the Supply Chain Manager.

19.    The only other members of Unipac's sales team to whom customer service employees directly reported were Duncan Simmons, who was born in 1957, and Jeff Boehmke, who was born in 1958.  The customer service employees who reported to Simmons were first reassigned to Unipac's Controller and thereafter to the Supply Chain Manager. Boehmke's customer service employees, who resided in England, were reassigned to report to Unipac Europe.

20.    As had been done in previous years, Unipac sales representatives submitted forecasts in approximately October 2004 as the "basis for their 2005 goals, ultimately set by Kelley and ITW."

21.    Boehmke resigned in April 2005.

22.    Kelley considered terminating plaintiff in the summer of 2005.  Unipac ultimately terminated plaintiff's employment on November 15, 2005.  Kelley recommended plaintiff's termination to Shaw, who approved it.  Both Kelley and Shaw informed plaintiff of the termination.

23.    Shaw never told plaintiff that the reasons for his termination included dissatisfaction with his performance.

24.    Kelley had hired a younger representative, David Preusker, less than two months before

7

terminating plaintiff, and he hired another younger representative, Lisa Droeghe-

Mawhorre, less than three months after terminating plaintiff.

25.    In December 2005, a month after plaintiff's termination, Shaw requested that Kelley

provide him with a summary of plaintiff's progress on his specific objectives.  Shaw

again asked Kelley to provide him with documents explaining plaintiff's termination one

month later in January 2006.

### V.  Opinion

**A.  FMLA Claim**

Plaintiff alleges that he was terminated in retaliation for exercising his rights under the

FMLA.  Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of

leave during any 12-month period . . . [i]n order to care for the . . . parent[ ] of the employee, if

such . . . parent has a serious health condition" or "[b]ecause of a serious health condition that

makes the employee unable to perform the functions of the position of such employee." 29

U.S.C. § 2612(a)(1)(C), (D).  The FMLA defines the term "serious health condition" to mean

"an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care

in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health

care provider." 29 U.S.C. § 2611(11).  "An eligible employee may elect, or an employer may

require the employee, to substitute any of the accrued paid vacation leave, personal leave, or

medical or sick leave of the employee for leave provided under subparagraph (C) or (D) of

subsection (a)(1) of this section for any part of the 12-week period of such leave under such

subsection . . ." 29 U.S.C. § 2612(d)(2)(B).

An employer is prohibited from discriminating against an employee who has used FMLA

leave, such as by using the taking of FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c). In FMLA cases that rely upon indirect evidence, the three-step *McDonnell Douglas* paradigm applies. *See Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d 309, 315 (6th Cir. 2001). A plaintiff may establish a prima facie case of retaliatory discharge under the FMLA by showing that (1) he availed himself of a protected right under the FMLA, (2) he was adversely affected by an employment decision, and (3) there is a causal connection between his exercise of a right under the FMLA and the adverse employment decision. *Id.* at 314 (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 315. If the defendant articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is a pretext for discrimination. *Id.* In order to establish a causal link, the plaintiff must "proffer evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982)).

The Sixth Circuit recently acknowledged that some "confusion in the case law" exists on the issue of whether temporal proximity between the time an employer learns of a protected activity and the time an adverse employment action occurs is sufficient, standing alone, to satisfy the causal connection element of a retaliation claim. *See Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008) (citing *Eppes v. Enter. Rent-A-Car Co.,* 2007 WL 1170741, *7

(E.D. Tenn. 2007). The Sixth Circuit held that,

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *See **Little v. BP Oil & Exploration Co***., 265 F.3d 357, 365 (6th Cir. 2001) ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.)

The Sixth Circuit explained that "[t]he reason for this distinction is simple" and explained it as

follows:

> [I]f an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

***Id***.

Plaintiff claims that he has established a genuine issue as to his prima facie case of FMLA

retaliation and that he can establish a causal connection between his use of FMLA leave and his

termination. Plaintiff contends that a jury could rely on a pattern of retaliation occurring "each

time he used his protected leave" and evidence that "[Executive Vice-President Phil] Gresh was

inexplicably interested in discussing Gross's cancer at some point before his termination" to

determine that after the second of two leaves taken by plaintiff, defendant put in place at its first

opportunity the mechanisms necessary to carry out plaintiff's termination. Specifically, plaintiff

relies on the following timeline:

| | |
|---|---|
| August 1999-<br>August 2003 | Plaintiff earns repeated promotions and is given glowing performance reviews and praise |
| Early Sept. 2003 | Plaintiff takes leave because of his father's heart attack |
| Sept. 24, 2003 | Plaintiff is put on a PIP, which allegedly includes a threat of termination, that he successfully completes |
| April - May 2004: | Plaintiff takes leave to treat cancer |
| December 2004: | Plaintiff is initially denied a raise and later is purportedly told that the 2004 raise is the last he will ever receive.  In addition, Gow notes the allegedly deleterious effect plaintiff's leave had on his performance. |
| January 2005: | Defendant begins a series of "reorganizations" of territories, assigning plaintiff unprofitable clients, increasing his goals while lowering the goals of other sales employees, and, for the first time, refusing to allow his input on his goals. |
| June/July 2005: | Kelley begins considering terminating plaintiff |
| September 2005: | Kelley begins discussing plaintiff's termination with Shaw. |
| November 2005: | Shaw and Kelley terminate plaintiff. |
| December/<br>January 2006: | Shaw asks Kelley to gather evidence supporting the decision to terminate plaintiff. |

Initially, it is important to note that although counsel for plaintiff represented at oral argument that the seven days of leave plaintiff took in connection with the illness and death of his father in September of 2003 was FMLA leave, there is no allegation in the complaint to that effect.  Plaintiff alleged in Count III of the Complaint ("FMLA Violation") only that "plaintiff availed himself of his right to FMLA leave because of *his* serious health condition" (emphasis added).  *See* Complaint ¶ 32.  Moreover, there is  no evidence in the record that supports plaintiff's counsel's representation that the September 2003 leave was FMLA leave.  To the

contrary, plaintiff testified at his deposition that the leave may have been handled under paid vacation.  Pltf.'s depo., p. 226.  Absent any evidence that defendant was required to treat the leave as FMLA leave and could not legally require plaintiff to substitute some other form of leave listed under § 2612(d)(2)(B), actions taken by defendant after plaintiff took time off in September 2003 are not competent evidence of retaliation under the FMLA.

Nor could a reasonable jury construe alleged evidence that "Gresh was inexplicably interested in discussing Gross's cancer at some point before his termination" as supporting an inference of FMLA retaliation.  Plaintiff has been careless in stating what the evidence shows on this point.  Plaintiff characterizes the testimony of Gresh that he cites in support of this proposition as follows: Sometime before the termination decision, Gresh asked about plaintiff's cancer because he wanted "an update," but Gresh could not articulate any reason he needed to know about plaintiff's cancer in deciding to terminate him. Gresh actually testified, however, that he had been told that plaintiff was going to take medical leave, he asked several weeks later for an update of what was going on because he wanted to know, and he found out that plaintiff had cancer.  Gresh depo., pp. 50-51.  Gresh's actual testimony thus demonstrates that he requested an update well over a year before the termination decision was made.  As the request was remote in time from the termination decision, it does not, without other evidence of retaliation, support an inference of a causal connection between plaintiff's FMLA leave and his subsequent termination.

Evidence regarding the alleged delay in the raise plaintiff received and the misinformation he was given in connection with that raise likewise cannot reasonably be construed as evidence of FMLA retaliation.  Plaintiff has produced no evidence to link either the delay in the

12

implementation of the raise recommended in his 2004 year-end review or the incorrect

information allegedly conveyed by Shaw with plaintiff's taking of FMLA leave seven months

earlier. In addition, the comment in the 2004 review under the category of "Customer Focus"

regarding the impact of personal and family matters on plaintiff's performance in this area is not

competent evidence of FMLA retaliation. As paraphrased by plaintiff in his opposing

memorandum, the comment sounds like a negative assessment of plaintiff's 2004 performance

attributable to personal and family issues. In fact, however, the actual comment, when read as a

whole, is not a negative assessment of plaintiff's performance for the 2004 review period. The

comment reads that plaintiff

> has overcome both personal and family matters this past review period that
> detracted from his performance in this area in 2003. He is a valued employee who
> understands customer's needs and how to gain cooperation from his peers.

Simply noting problems from the prior year that plaintiff had overcome does not constitute

evidence of a pattern of retaliation.

The only other evidence plaintiff offers of a causal connection between his FMLA leave in

April/May 2004 and his termination 18 or 19 months later in November 2005 is the temporal

proximity between the two incidents. This expansive period of time is too great, however, to

support an inference of retaliation. Assuming, without deciding, that the intervening events

plaintiff cites could reasonably be construed as adverse employment actions for purposes of an

FMLA retaliation claim, the time lapse between plaintiff's FMLA leave and those events is

likewise too great to support an inference of a causal connection. At least seven months elapsed

between the leave and the earliest of the adverse events he alleges. This is not "close in time" so

as to permit a reasonable jury to find a causal connection. The rationale for allowing temporal

proximity to serve as the sole evidence of a causal connection is lacking under these circumstances.

For these reasons, defendant is entitled to summary judgment on the FMLA claim.

## B. Age Discrimination Claim

Under the law of the Sixth Circuit, the same evidentiary framework applies to discrimination claims brought under Title VII, the ADEA, and state law. ***Mitchell v. Toledo Hospital,*** 964 F.2d 577, 582 (6th Cir. 1992). A plaintiff claiming age discrimination must introduce either direct or circumstantial evidence that the defendant discharged the plaintiff because of his age. ***Blair v. Henry Filters, Inc.***, 505 F.3d 517, 523 (6th Cir. 2007) (citing ***Smith v. Chrysler Corp***., 155 F.3d 799, 805 (6th Cir. 1998)). Plaintiff may establish a prima facie case of age discrimination through circumstantial evidence by showing that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position lost; and 4) he was replaced by, or treated less favorably than, a substantially younger individual, which may include an individual within the protected class. ***Mitchell,*** 964 F.2d at 582; ***O'Connor v. Consolidated Coin Caterers Corp.,*** 517 U.S. 308, 313 (1996). The Sixth Circuit has held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." ***Grosjean v. First Energy Corp***., 349 F.3d 332, 340 (6th Cir. 2003).[1]

---

[1] Plaintiff questioned at oral argument whether ***Grosjean*** is still good law in view of the United States Supreme Court's ruling in ***Mendelsohn v. Sprint/United Mgmt. Co***., 128 S.Ct. 1140, 1147 (2008). The Supreme Court in ***Mendelsohn*** addressed the discretion of the district court to make determinations of relevance and prejudice under Fed. R. Ev. 401 and 403 and noted that such determinations are made in the context of the facts and arguments in a particular case and thus are generally not amenable to broad *per se* rules. Neither the Supreme Court's holding nor dicta call into question the holding in ***Grosjean***, which does not involve the rules of evidence. The Court therefore remains bound to follow ***Grosjean***.

A person is replaced only when another employee is hired or reassigned to perform the individual's duties. *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chemical*, 636 F.2d 1117, 1118 (6th Cir. 1980)) (finding that the plaintiff was not replaced but that his former duties were assumed by another employee, who performed them in addition to his other functions). If the plaintiff seeks to establish that he was treated less favorably than a similarly-situated, substantially younger employee, he must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id*. at 352 (quoting *Mitchell,* 964 F.2d at 583).

The Sixth Circuit has noted that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose-an allegedly discriminatory disciplinary action resulting in the termination of the plaintiff's employment." *McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005) (citing *Ercegovich*, 154 F.3d at 352). The *McMillan* court clarified that the specific factors addressed in *Mitchell* "generally are all relevant considerations in cases alleging differential disciplinary action," but courts should not assume that the specific factors discussed in *Mitchell* are relevant in cases arising under different circumstances. *Id*. Rather, in such cases, courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id*. at 414; *see also Seay*

15

*v. Tenn. Valley Auth.,* 339 F.3d 454, 479-80 (6th Cir. 2003).

The United States Supreme Court has cautioned that the elements necessary to establish the prima facie case are flexible because "[t]he facts necessarily will vary in Title VII cases, and the specification [ ] of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13 (1973).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id.* at 804.

The United States Court of Appeals for the Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision. *Manzer,* 29 F.3d at 1084.

16

Although the court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination.  *Wexler v. White's Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003).  The Court in *Wexler* addressed the extent to which the reasonableness of an employer's decision may be considered:

> [T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.  *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998)(holding that, in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into 'whether the employer made a *reasonably informed and considered decision* before taking an adverse employment action')(emphasis added); *In re Lewis,* 845 F.2d 624, 633 (6th Cir. 1988)('Sears does not have to establish that the basis on which it acted in firing Lewis was *sound;* rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual.  One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.') (emphasis in original) (internal quotation marks omitted).

*Id*.

Plaintiff alleges that he can establish a prima facie case of age discrimination because he can show that he was replaced by a substantially younger individual.  Plaintiff contends that defendant hired "the younger" Droeghe Mawhorre less than three months after his termination and she took over five of his top accounts.  He also claims that Chris Traikos, born in 1975, took over his biggest account, Rexam.  Plaintiff contends that a jury could also determine that defendant replaced him with Pruesker, born in 1963, because (1) Shaw admitted that plaintiff was terminated at approximately the same time that Kelley hired Preusker, which was two months earlier, to fill a sales position in the Chicago area (Shaw depo., pp. 26-28), and (2) the head count in defendant's sales organization remained the same after plaintiff's termination because of Preusker's hire.  Defendant denies that plaintiff was replaced and contends that plaintiff's accounts were immediately redistributed to Kelley (born in 1954), Shaw (born in 1958) and Simmons (born in

1957), and that several of the accounts were later inherited by Droeghe-Mawhorre, who defendant argues is not considered substantially younger than plaintiff under Sixth Circuit case law.

The first three elements of a prima facie case are satisfied.  Plaintiff is a member of the protected class, he suffered an adverse job action, and he was qualified for the position he lost.  As to the fourth element, the circumstances of this case do not fit neatly within the traditional framework of a prima facie case.  The Court nonetheless finds that plaintiff can establish a prima facie case given the small number of individuals in the sales department, all of whom worked out of their home offices; evidence that the sales department was treated as a whole; and evidence that close to the time plaintiff was terminated, defendant hired into the sales department two individuals who may be considered to be "substantially younger" than plaintiff (Droeghe-Mawhorre, who is 6½  years younger than plaintiff, and Preusker, who is approximately 10 years younger than plaintiff).

In addition, there are genuine issues of material fact as to whether younger individuals were treated more favorably than plaintiff was treated.  Plaintiff alleges that he was the only sales person to meet his goals in 2004, and no individual who failed to meet their 2004 goals was disciplined for failing to do so.  Plaintiff further alleges that Kelley gave assurances that the sales group would be treated as a whole, but when his sales group fell short of its goal by approximately $5 million in 2005, no employee aside from plaintiff was disciplined or terminated for 2005 sales figures.  Plaintiff contends that defendant terminated him for allegedly failing to meet his artificially inflated sales goals while retaining substantially younger employees who also failed to meet their 2005 sales goals.  In addition, there is a question as to whether defendant failed to follow its progressive discipline policy for plaintiff while following it for younger individuals.

18

Case: 1:06-cv-00205-HJW-TSB Doc #: 61 Filed: 08/27/08 Page: 19 of 25 PAGEID #: 1279

Specifically, plaintiff argues that whereas he received no warning before being terminated, Preusker, who had been the subject of customer complaints regarding his level of professionalism, received a 30-day PIP on July 19, 2006, which stated "We are willing to work with you," and which offered him at least his second full day "refresher on products and pricing."

Based on these alleged differences in the treatment defendant afforded plaintiff and younger sales representatives, the Court finds that plaintiff has come forward with sufficient evidence to establish a prima facie case of age discrimination.

Defendant has satisfied its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. Defendant claims that it terminated plaintiff because of significant performance deficiencies, including a sales deficit of approximately $2,711,000, and multiple complaints to defendant that plaintiff could not satisfy its top customers. Defendant also claims that is it entitled to the benefit of the same actor inference because the same individual hired, promoted and terminated plaintiff.

Plaintiff alleges that the reasons defendant offers for his termination are pretextual. Plaintiff challenges defendant's reliance on alleged customer complaints to establish that it terminated him for poor performance. Plaintiff claims there are genuine issues of material fact concerning the alleged customer complaints about him. Plaintiff notes that defendant relies on an affidavit by Mike McDaniel of Owens-Illinois, but plaintiff claims he met McDaniel only a few times and never dealt with him directly and that the affidavit relies on complaints by others to establish McDaniel's alleged decision to request a different sales team member, which allegedly makes the affidavit double hearsay. Plaintiff also objects that defendant never identified

McDaniels as a witness in its Responses to Interrogatories.[2]  Plaintiff also contends that a jury could reject any alleged complaints by Owens-Illinois as the real reason for his termination because for the three years he was responsible for the account, there were problems in defendant's manufacturing plant involving defendant's product that never got resolved, but plaintiff nonetheless took all necessary steps to respond to the issues raised by Owens-Illinois while still taking care of other customers.  Plaintiff notes that in June 2002, Kelley drafted a memo praising plaintiff's handling of an unnamed account, which was either the Owens-Illinois or Rexam account; in November 2005, Kelley praised plaintiff's handling of the Owens-Illinois account (although the exhibit in support of this proposition, exh. O to his Opposing Memorandum, does not refer to his handling of the account in any manner, but simply copies him on an e-mail thanking some others for their efforts on the account); and plaintiff never heard that McDaniels requested that he no longer work with plaintiff, and instead Kelley told plaintiff he was being taken off the account because he deserved a break from the extraordinary difficulties with the account engendered by the product defects.  Plaintiff alleges that he was able to almost double Owens-Illinois' business in the five years he managed the account, but that Unipac's sales to Owens-Illinois were down over $1.5 million under Kelley's attention.

Plaintiff disputes Seaquist's alleged complaints because the only evidence defendant offers is Kelley's deposition testimony and affidavit stating that Barry Blum at Seaquist requested that plaintiff not be assigned to the account, which plaintiff challenges as self-serving.  Plaintiff also alleges that a jury could conclude that complaints by Seaquist were not the real reason for his

_____

[2] Defendant asserts that it identified McDaniel in its Supplemental Rule 26(a) Initial Disclosures.

termination because the complaints happened in 2003, two years before his termination, at which time he was not responsible for either Owens-Illinois or Seaquist. He claims that after the alleged complaints, he received a positive performance review praising him for his full understanding of his customers' needs. Plaintiff also asserts that he does not recall Kelley ever reporting complaints from Seaquist in 2003 and he does not recall having a "very bad experience" with them in 2003. Finally, plaintiff offers an explanation for a complaint by Rexam about him regarding Rexam's failure to earn a sales incentive and plaintiff's alleged failure to adequately communicate with it about the rebate. Plaintiff claims a jury could therefore conclude that any complaints did not cause defendant to conclude that plaintiff was performing poorly and merited termination.

In addition, plaintiff claims that he can establish a genuine issue of fact as to whether he was terminated for allegedly poor sales performance in 2005. Plaintiff asserts that in its motion for summary judgment, defendant inflates plaintiff's actual sales variance, asserting a $2.7 shortage when its own documents support only a $2.4 shortage and failing to note that the losses are reported in Canadian dollars. In addition, plaintiff claims that the decision makers attempted to manufacture reasons for his termination and defendant failed to follow its own policy in terminating him by failing to practice progressive discipline. Instead, plaintiff contends that he received only one performance warning in 2003, any discussions about performance in 2005 did not indicate his job was in jeopardy, and any warnings about poor sales number were made generally at sales meetings in May and September of 2005. Plaintiff also alleges that when Shaw and Kelley terminated him, they never mentioned performance issues and never made him aware that any customer had requested that he be removed from their account. Instead, plaintiff contends that Shaw and Kelley claimed that they were terminating him as a result of a reorganization.

21

Plaintiff asserts that there were no documents created before his termination establishing performance as the reason for the termination and that Shaw asked Kelley for rationalizations after the fact, which alone is sufficient reason for a jury to find pretext.

As further proof of pretext, plaintiff relies on the evidence set forth above which allegedly shows that he was treated less favorably that substantially younger colleagues.

There are genuine issues of material fact that preclude a determination on summary judgment as to whether the reasons offered by defendant for plaintiff's termination are a pretext for age discrimination. Initially, the Court notes that the "same actor" inference allows, but does not require, a jury to infer that no discrimination occurred from the fact that the same person both hired and fired the plaintiff, and the inference is not properly made by the court on summary judgment. *See Wexler*, 317 F.3d at 572-73.

Furthermore, the Court finds that while it is an employer's prerogative to consider customer satisfaction when deciding whether to retain or terminate a sales representative, there are genuine issues of material fact as to whether the customer complaints cited by defendant were the true reason for plaintiff's termination. Defendant alleges that Seaquist and Owens-Illinois reported that they were no longer willing to work with plaintiff as their account representative around September 2003, but there is evidence showing that plaintiff subsequently received favorable comments concerning his interactions with customers in his 2004 review. A reasonable jury could question whether defendant, in making the termination decision, actually relied on customer complaints made prior to plaintiff's favorable 2004 performance review and a considerable amount of time before the termination decision.

Other evidence regarding the circumstances surrounding plaintiff's termination raise an

22

issue as to whether plaintiff's allegedly poor sales performance was the true reason for his termination. Plaintiff testified at his deposition that he was not told that he was being terminated because of his job performance, he does not recall Shaw telling him prior to his termination that Shaw was dissatisfied with his job performance, and he does not recall receiving oral or written notice from Kelley in 2005 that Kelley was dissatisfied with his job performance. Pltf.'s depo., pp. 191-193, 195, 197. In fact, plaintiff testified that immediately after his termination, Kelley contacted him with an offer to write a letter of recommendation. Pltf.'s depo., p. 196. There is no dispute that Kelley subsequently contacted plaintiff in July 2006 to discuss a position with Kelley's new company. *Id*.; Kelley depo., p. 144. In addition, Kelley testified that sometime in 2006, a prospective employer contacted him regarding plaintiff, and he advised the employer that he believed plaintiff could do a good job in a well-managed, well-described position (which Kelley thought plaintiff's position with defendant had been). Kelley depo., pp. 144-45. A reasonable jury could infer from this evidence that Shaw and Kelley were not dissatisfied with plaintiff's job performance in the months leading up to his termination. In addition, evidence that Shaw requested documentation explaining the reasons for plaintiff's termination one to two months following the termination calls into question whether the reasons subsequently given for plaintiff's termination were formulated after the fact. For these reasons, defendant is not entitled to summary judgment on plaintiff's age discrimination claim.

**C. Public policy claim**

Plaintiff does not challenge dismissal of his public policy claim. Accordingly, defendant is entitled to summary judgment on the public policy claim, Count II of the Complaint.

23

**D.  ERISA Claim**

Plaintiff alleges in the complaint that defendant violated ERISA by terminating him in order to interfere with the anticipated use of his medical and disability benefits to which he was entitled under defendant's Employee Welfare and Benefit Plan.  Plaintiff alleges in his opposing memorandum that defendant's action violated 29 U.S.C. § 1140, which provides that it shall be illegal for an employer to "discharge . . . or discriminate against a [benefits plan] participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . ."

A plaintiff can establish a prima facie case of interference with ERISA rights by showing the existence of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." ***Humphreys v. Bellaire Corp.***, 966 F.2d 1037, 1043 (6th Cir. 1992).  If the plaintiff establishes a prima facie case, the employer has the burden to "introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action." ***Id***.  If the employer carries its burden, the "presumption of wrongful action drops from the case, and the plaintiff must either prove that the interference with pension benefits was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." ***Id***.

Because there are numerous issues of material fact as set forth above concerning plaintiff's allegedly dissimilar treatment and the true reasons for his termination, it is for a jury to determine whether one of those reasons was interference with the attainment of plaintiff's ERISA rights.  Accordingly, defendant is not entitled to summary judgment on the ERISA claim.

24

## VI. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** as to plaintiff's claims for violation of the FMLA and Ohio public policy, and those claims are **DISMISSED**.  The motion is **DENIED** as to plaintiff's claims for age discrimination and interference with ERISA rights.  The case will proceed to trial on those claims in accordance with the schedule established by the Court.

**IT IS SO ORDERED**.


S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT